Barnum, Hammond, Stephens & Hoyt, Youngstown, for plaintiff in error.

E. T. Phillips, Youngstown, and Kury Wilkins, Campbell, for defendants in error.

### RICHARDSON, An Infant, etc v FELT, JR, An Infant, etc

Ohio Appeals, 7th Dist, Mahoning Co

Decided March 24, 1933

ROBERTS, J.

It was claimed in the action in the Court of Common Pleas that both Richardson and Puncec were guilty of negligence, and this was the conclusion of the jury. It is claimed now by the plaintiff in error that he was guilty of no negligence whatever in the accident and that the accident was caused by the sole negligence of Puncec. Whether or not Puncec was guilty of negligence is not very important in a consideration of this case; in any event, not unless it can be said to have been shown that he was the only person who was negligent, which in effect would release Richardson from liability.

In this connection it may be said that Puncec was paralyzed in his lower limbs. On this occasion he had taken in this child and some other children—I do not recall how many he had in the car—out for a ride upon a muchly traveled highway on Sunday afternoon. If nothing else is indicated it is the desirability of frequently suggested legislation requiring the examination of applicants as to physical and mental fitness for operating an automobile before being permitted to do so.

Proceeding more directly to the proposition as to whether there was reversible error in the finding of Richardson guilty of negligence, the evidence discloses that this east and west highway was paved twenty feet in width easterly from Coitsville Corners. The road was straight and extended perhaps seven hundred feet to what is described as the "hump" is located, where there was a higher point of ground or slight hill, from which hill there was a four per cent gradual grade to the point of collision. For considerable more than this distance a person in an automobile going westerly had a view of the road to Coitsville Corners. The Puncec automobile when standing off from the improved road and in front of the gasoline station perhaps would not be visible to the driver of a car approaching from the east until within about four hundred feet of the intersection.

The evidence and a plot which was introduced in evidence, which plot has evidently been drawn to a scale, and the accuracy of which is not questioned, indicate that while these paved roads were some sixty feet in width, the paved portion was twenty feet, but at the intersection there was for a considerable distance in all of the four directions a gradual curved widening of each of these roads at the intersection, with the result that a circle drawn with the center of the intersection as the center of the circle, indicates that this curving widening of Route 422 on the easterly side of the corners so extended in a curve in a northerly direction that the paved portion at this intersection north and east of the center was at no point less than fifty feet distant therefrom.

Then it may be further observed that as a car would approach from the east and came into the line of the north and south road, the paved portion would extend indefinitely north and from a width of fifty feet or more gradually lessening to a point one hundred feet or more north of the intersection.

Richardson testified, as is recalled, that he was driving perhaps thirty-five to forty miles an hour; that he had gradually lessened the speed of his car to about thirty-five miles. The testimony of numerous witnesses indicates generally that the speed of Richardson's car was presumably thirty-five to forty miles an hour as it approached this intersection. One of his companions observed the Puncec car when some two hundred feet distant therefrom, as the distance is now recalled. Richardson did not observe the Puncec car until he was within seventy-five feet of the intersection. He blew his horn, as he claims, when he was

within fifty feet, and attempted to stop his car or lessen its speed when he was within twenty-five feet. The testimony varies as to the precise position of the Puncec car, some witnesses testifying that the front end of the car was immediately under the traffic light, others that it was the rear end which was under the traffic light. There is substantially no dispute but that the car was standing in a diagonal direction across the intersection headed southeasterly. Puncec himself testifies that when he left the gasoline station he proceeded across the north and south road, or partially across, and made the military turn to the south. Richardson claims that not being able to stop his car and avoid the collision he attempted to turn to the right and pass the Puncec car and thus avoid the accident, but that he did not have room to so do upon the pavement. That he is correct in this statement is contradicted by the general testimony of the witnesses and by the environments attaching and surrounding this accident. If the Puncec car had only proceeded to the extent of having its front end under the traffic light and it extended back in a northwesterly direction, presumably then it would not reach over about ten feet north of the center east and west line. Richardson then had an east curve which might have been made with some forty feet unobstructed of paved road between the Puncec car and the circumference of this one hundred foot circle. Not only that, as he approached the intersection he had an unlimited distance of paved road to the north which was perhaps more than fifty feet wide immediately north of the north line of the east and west road and narrowing gradually north therefrom. No reason is apparent from the testimony and from the practically undisputed facts in the case why Richardson might not have deviated the course of his car to the right and passed around the Puncec car, with ample room to do so. He says he was not able to do it and presumably the left front part of his car came into collision with the rear part of the left side of the Puncec car, with the result that both of them were overturned.

Richardson was famialiar with the conditions at the point of the accident. He knew of the presence of this warning sign overhead. He knew that it indicated danger and suggested caution in approaching and passing this place. He knew that he was driving on a pleasant Sunday afternoon in the summer time, where presumably such travel might have been anticipated, although there was, as a matter of fact, at this time no other cars in the vicinity which interfered in any way with this accident There was a car parked at the southwesterly corner of the intersection and from which several occupants observed the accident and testified concerning it.

Richardson approached this crossing at an unsafe and dangerous rate of speed. He did not give due and proper heed to what he was doing and what he was approaching. He did not observe the Puncec car as soon as he could have done. He testifies that his brakes were good and that he could have stopped his car within some twenty-five feet, yet he did not do so. He didn't attempt to stop his car until within twenty-five feet and then evidently with no appreciable effect upon the speed of the car, which is the only reason which can be imagined why he was unable to deflect it slightly to the right and pass around the passing car. Puncec says that before starting from the gasoline pump he looked and saw no traffic; that he proceeded out into the intersection and looked again and saw no approaching car.

This presents the odd proposition in view of the fact that almost immediately after the collision occurred the Richardson car must have been in close proximity, and if he looked he saw it and he was negligent in proceeding on into the intersection, and if he did not see it he was negligent. Whether his infirmity may have had something to do with the accident may be somewhat questionable. As he says, he did not see the car and therefore did not attempt to stop his car.

Puncec says he was only driving at about six miles an hour. Presumably this was true, and I think concededly so, so far as the presentation of the case was concerned, and the testimony of numerous witnesses is to the effect that Richardson and Puncec entered this one hundred foot diameter circle at about the same time. This, we think, is necessarily a mistake, for the reason that if, as is undisputed, Puncec was only traveling about six miles an hour, and Richardson was traveling thirty five miles or more an hour, Richardson was driving five times as fast, or more, than Puncec, and Puncec being fifty feet away from the intersection, Richardson must have been some two hundred and fifty feet away, with all the intervening time and space to observe and protect himself from the other car against this impending collision.

Richardson had no assurance as to what direction Puncec might be intending to

take. If to go north, no harm would result. Puncec, however, so far as Richardson knew, might have been intending to proceed easterly, southerly or turn back and go westerly after having filled his gasoline tank.

The photograph which has been introduced indicates very clearly the surroundings of this accident and shows that Richardson even beyond the width of the pavement as he approached this intersection might have traveled upon the berm, and there is nothing in the picture to suggest that he might not even have left the highway and gone out and across the yard into the intersection without danger or inconvenience. We reach the conclusion that there was no reversible error in this case in the jury finding that Richardson was guilty of negligence in this action.

It is claimed that reversible error occurred in the introduction of certain testimony. Among other injuries which this little boy received was the loss of his left eye. Dr. Kauffman was called and this question was asked:

"Q. Do or did the industrial concerns with which you were familiar with in this valley pass men for employment who had only one eye?"

The answer was, after objection had been overruled and exception made:

"A. The concerns with which I am familiar do not allow your patients to be passed.
Q. Do you mean by that, Doctor, they just wouldn't hire them?
A. Yes, sir."

Then Dr. Speck was called and inquiry was made of him:
"Q. What can you say to the court and jury as to whether or not a concern in this valley will employ men with an eye out?"

Then follows an objection and a question by the court as follows:
"Court: Objection sustained in that form. What would you say, Doctor, as to whether a person having lost an eye and being over the age of 21 years would be eligible to employment in the industrial concerns of which you have knowledge.

Objection; overruled; exception.

A. Those requiring a medical examination before they are hired would be rejected; those that don't ask for a medical examination, like Meller Brothers, or Heller-Murray building contractors, but those requiring a medical examination would automatically reject him as a prospective employe."

These two doctors were thus permitted to testify to the effect that at least in the special institution or mill with which they were connected, concerning which they had knowledge, would not employ men who were blind in one eye. It is claimed that prejudicial error occurred in the introduction of this testimony. This was not a proposition of expert testimony but these doctors were inquired of simply as a matter of fact as to what they knew, and their evidence indicates that they had no knowledge except perhaps in one instance in regard to each witness for which mill perhaps they performed some duties in examination of prospective employes or care of persons injured.

This is an unusual question. While it is urged as error by counsel for the plaintiff in error, no authorities were cited in support of that contention, and no authorities are cited by counsel upon the other side indicating or suggesting the competency of this line of inquiry. So far as our experience goes, it is a novel proposition. Perhaps in the search of authorities and inability to find them, this has even been attempted, the proper rule may be determined as a matter of exclusion and elimination when those things which may be proven are proper for consideration.

In an action of this kind, for personal injury, the extent of recovery is compensation for the injury received and testimony generally is competent. This line of cases are very numerous, the manner and the extent of the injury, disability resulting, the pain and suffering which has been caused by the injury, such conditions existing up to the time of the trial may be testified to with certainty, some of them, perhaps the amount of suffering, largely depending upon the party who has been injured. Damages may be awarded for future conditions, where they are reasonably certain to occur or exist in the future. While a culpable party should be held to respond for the injurious results of his careless or wrongful conduct, the rule of recovery is compensation for the injury which has resulted, and when we attempt to delve into the future and determine what injury or damage may occur or exist in the future, that is something which generally is to a considerable extent speculative, so that the rule restricts right of recovery in that respect to

conditions indicating injury or damages which are reasonably certain to exist in the future.

Now, what would be the fact in the proposition under consideration? The defendant should be called upon to pay for what injury he has caused, but of course should not pay for things which are merely conjectural or speculative or may possibly exist in the future. This boy was five years old when the accident happened. The question asked was in regard to the conditions when he became twenty-one years of age, or sixteen years later. These questions and answers do not elicit information as to a general condition but only what the custom at that time was in two particular mills. Whether that would exist in the future, or fifteen years later, or not is a mere matter of guess. Then with the uncountable multitude of locations and vocations from which an individual may select his life work, it is a remote proposition that he would even desire to be a worker in one of these two places mentioned by these doctors. The loss of the eye with no injury as is said to be the fact, to the other eye, and having good sight in the right eye and is actually good so far as the eye-sight is concerned, is perhaps not very appreciably impaired. It seems to be evident that a rule in this regard such as is inquired about, if it does exist, is not enforced because a man with one eye would not be able to do satisfactorily and skillfully such work as he might seek to engage in, but for the same reason that men forty-five years of age or older have a great deal of difficulty in securing employment in these mills; that is, at their age the hands are perhaps a little less deft and the limbs a little more clumsy, not quite such good control over the functions of the body as the younger man, greater and constantly increasing danger of accidents, and while a man with one eye might do his work just as well, he wouldn't have the broad field of vision with one eye that he would with two and could not so readily appreciate conditions on his left side, might be a little more undesirable as an employe by reason of danger to be possibly apprehended, and not because, however, this accident impaired his ability to do the work or lessened his ability to do it with one eye from what he could do it with two eyes. So it is doubtful whether the rule applies to these conditions or not.

An examination of 8 R.C.L., commencing at about page 420, and following through to page 545, discloses that such may be found in regard to the rules applicable to the rules of damages in similar cases of this kind, and while little, if anything, is said about inability to secure work, much is said in stating what are the elements of damage and right of recovery may be by elimination when this right may be excluded. Also in 17 Corpus Juris, under the subject of damages, this work with the citation of a great many authorities may be examined with care without finding, perhaps with a single exception, an effort to introduce this kind of proof. In 17 Corpus Juris it is said, on page 783:

"There can be no recovery for mere inability to find work after the injury as distinguished from inability occasioned by plaintiff's incapacitation from labor because of the injury."

Turning now to the case of Weber Wagon Company v Kehl, 29 NE, 715, an Illinois case, this was a case in which the person injured had lost a hand. It is said:

"It is also claimed that it was error to allow the plaintiff to testify that he had not been able to find work since his injury."

That approached the proposition under consideration, the loss of ability to secure work. The text proceeds:

"The fact of itself that plaintiff was not able to find work could not be regarded as an element of damages in a case of this character, but upon looking into the record it will be found that the reason plaintiff could not find work was on account of his limited capacity to perform labor on account of his injury. If plaintiff was incapacitated for labor on account of the injury that was an element of damages proper for the consideration of the jury."

Thus we may evolve the rule from what is said in this case that damages extended to and included limited capacity for the performance of labor but does not include inability to secure employment by reason of this incapacity. When you go beyond the line of demarcation between these two propositions from limited capacity, then the right to determine goes from the evidence upon that proposition to the jury to determine as a matter of fact the extent of the jury.

It must be wholly apparent that no tangible result could be obtained by considering this proposition of inability or limited ability to secure labor. No one would know what the effort was, the extent of the regu-

lations against such employment, very remote, possibly that a man, or in this instance a five year old child, would ever attempt such a particular employment. It might even be speculative as to whether it would be an injury. I remember reading a considerable time ago a very interesting article by a man of considerable prominence who in youth had been rendered physically helpless by infantile paralysis, and he was of the opinion and said that that was the best thing had ever happened to him, that it was a benefit because without that inability he probably would have followed some line of physical effort, but being deprived of that he had made a great success in life by developing his mental capacity.

The conclusion reached is that prejudicial error did occur in the introduction of this testimony.

It is again urged that the verdict was excessive, that it was the result of passion and prejudice and that the cause should be reversed for this reason. Time will not be taken to go into the extent of these injuries or consider them. The left eye was stricken out by this accident. There were cuts and abrasions upon the face, scar tissue would have to be taken out of the eye socket before a false eye could be inserted, and those have to be replaced, it is said, substantially every two years, that as this child grows to manhood the muscles in the immediate vicinity of this eye will not develop with the body and will result in disfigurement in this way.

There is another proposition which suggests itself to me as an element of damage and it has not been argued, and that is while this boy has one eye which is good now and presumably will be and which the loss of the other would not cause a great deal of impairment. Occasionally, however, the light goes out of the second eye and that is a horrible calamity, so that if any harm should come to the right eye it would be much more serious than if the boy had two eyes at that time, and it seems to me whatever danger exists in that respect would be subject to consideration. However, in view of the fact that we have no means of determining how persuasive this testimony of refusal of certain industries to employ one-eyed men may have been to the jury, to what extent that testimony is accountable for this verdict of $22,000 we do not know. Perhaps the jurors themselves could not tell precisely how they were influenced in that, in reaching the conclusion which resulted in the verdict.

In view of the fact that perhaps this evidence will not be in the case in a future trial, while this was a large verdict the injuries were no doubt very serious, and we do not consider it desirable or important to suggest a conclusion upon that proposition at this time, but for the introduction of this testimony the judgment of the Court of Common Pleas is reversed.

Judgment reversed.

FARR and POLLOCK, JJ, concur in the judgment.